MICHAEL B. BERNAYS
State Bar No. #007057
801 N 1st Avenue
Phoenix, Arizona 85003
Phone: 602-254-5544, Ext. 103
Fax: 602-254-9263
E-mail: mbernays@jennagroup.com

Attorney for Defendant

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| United States of America,<br>Plaintiff,<br>v<br>Rochelle Renee Conlin,<br>Defendant. | ) | Case No. CR 21-08082-01-PCT-SMB<br><br>**SENTENCING MEORANDUM, REQUEST FOR DOWNWARD DEPARTURE AND REQUEST FOR DOWNWARD VARIANCE** |

The defendant, Rochelle Renee Conlin, through counsel, Michael B. Bernays, hereby submits the attached Memorandum of Points and Authorities, addressing Ms. Conlin's request that the Court grant her both a downward departure and a downward variance, together with a psychological assessment performed by Dr. Laura Brookham offered in support of the requested variance; and based thereon, asks the Court to sentence her to a term of probation with no incarceration, all as is more fully set forth below.

RESPECTFULLY SUBMITTED this 6th day of March, 2023.

s/ Michael B. Bernays
Michael B. Bernays
Attorney for Defendant

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Rochelle Conlin is a young woman who has experienced some horrific events in her life. Abandoned by her natural father, she was physically and sexually abused by her step-father, which physical abuse also was directed toward her mother. This abuse only stopped when he was arrested for the attempted murder of her mother and died in jail awaiting trial. Her trials of abuse at the hands of men did not end there. Her boyfriend and the father of her two children also abused her physically and sexually, until their relationship was terminated by his arrest. It is little wonder, then, that when Christian Milz came into her life, a handsome, suave, and supportive man for a change, who encouraged her to pursue her education and make a better life for herself, she fell under his sway and thought she had found someone to share her life with. He even got her interested in new and exciting activities, particularly target shooting. He encouraged her to buy guns with and for him, explaining that since he was from California he couldn't buy guns in Arizona; but he always supplied the money for the purchases.

One can only imagine the shock that must have hit Rochelle when, within a two-week period, her life was once again turned upside down by Christian's breaking off of the relationship, his removal of all the guns they had bought together except for one, and the arrival at her door of ATF Agents bringing the news that her boyfriend of nearly two years was not who or what he pretended to be; that his name was not Christian Milz but was Keymal Rucker; that his inability to buy firearms had nothing to do with his residency and everything to do with the fact that he had a felony conviction out of California; and that her assistance to him had placed her in jeopardy of a 58-count federal indictment for firearms offenses.

A google search for synonyms of "hoodwinked" resulted in fifty-one entries,

ranging from "deceive," "trick," and "dupe" to more colloquial sayings such as "snooker," "befool," or "hornswoggle." Any of these could be used to describe Rucker's lies to Rochelle that induced her to collaborate with him in the purchases of the guns underlying this indictment. His actions truly could be prosecuted as a fraud scheme under Arizona law with Rochelle as the victim.[1] Especially when viewed against the backdrop of Rochelle's previous history of abusers, it is easy to understand how devastating the ATF agents' revelations to her were. Even in that maelstrom of emotions and uncertainty, Rochelle made a decision to co-operate as fully with the investigation as she could.

In the aftermath of her meeting with the agents (they did not immediately arrest her at that time,) Rochelle worked very hard to re-assemble her life. She is a certified medical assistant, with dreams of become a registered nurse, and continued on that career path. She has two children, A-lizbeth, 12, and Dallas, 10, from her prior relationship with Brad Johnson. Mr. Johnson apparently has little to no contact with the children. Dallas has dyslexia and ADHD and gets help at home through on-line services.

Rochelle works at Carson Medical Group in Carson City, Nevada. She has been there since September of 2020, and anticipates that this conviction will not affect her employment there. Included in a group of letters in support of Ms. Conlin are letters from her supervisors, Jacqueline Dyer and Jennifer Antle. Ms. Antle praises her as "dependable and professional" and credits her as doing an "outstanding job every day as a medical assistant." Ms. Dyer emphasizes Rochelle's "kindness,

---

[1] A.R.S. §13-2310 defines a Fraudulent Schemes and Artifice as "Any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions is guilty of a class 2 felony." Rucker certainly received a benefit by his false representations to Rochelle as to who he was and what he was up to with all those guns.

patience, and dependability," and acknowledges that Rochelle is a "very valuable employee."

Rochelle has finally found a relationship in which she is neither manipulated nor abused. She was engaged to Angela Bradwell last February 11th, and their wedding is scheduled for June 3, 2023. Angela has a six-year old daughter and the blended families reside in Carson City.

She also enjoys a renewed relationship with her mother and step-father, both of whom also wrote letters for the Court's consideration. Throughout the letters we are submitting for the court, friends, co-workers, and family all speak in common themes of loyalty, kindness, and diligence. These, unfortunately, are probably the same qualities that made her so susceptible to the nefarious importunings of Milz/Rucker; but the good news is that her negative experience with him has not extinguished those admirable qualities from her life.

## II. MS. CONLIN SUFFERS FROM PREVIOUSLY UNDIAGNOSED PTSD AND TREATMENT FOR THAT ISSUE IS STRONGLY RECOMMENDED

At Ms.Conlin's request, the Court authorized funds for a psychological assessment to be done by Dr. Laura Brookham at Red Mountain Psychological Services. A copy of that Evaluation is include here as Exhibit A. Dr. Brookham administered several psychological tests, including the Trauma Symptom Inventory-2, and did a clinical interview. Based on these assessments, Dr. Brookham has diagnosed Rochelle as suffering from Post-Traumatic Stress Disorder, and opines that she is in need of psycho-therapeutic counseling to address that disorder. As Dr. Brookham says, "It is not surprising [given her abusive life] at all that Ms. Conlin developed symptoms of Post-Traumatic Stress Disorder, although it is astonishing that she has not developed symptoms of other chronic mental health conditions. The few protective factors in her life, including her relationships with her mother and brothers, and her average IQ, appear to have interacted with some unidentified

resilience to make her a relatively productive member of society." Psych. Eval, p.15.

Dr. Brookham also opines that her previous experiences of abuse at the hands of men who should have cared for and protected her made her peculiarly susceptible, and blind towards, the manipulation to which she was subjected by Milz/Rucker: "Where her psychological symptoms most significantly impact her functioning, however, is in her interpersonal relationships. She has been in relationships with men that have replicated aspects of her childhood abuse including physical abuse, emotional abuse, and manipulation. Although she was quickly able to identify overt physical assaults as abusive, it was considerably more difficult for her to detect the manipulation and emotional abuse perpetrated by the man involved in her current legal case." Id.

## III. A DEPARTURE PURSUANT TO 5K1.1 IS APPROPRIATE IN THIS CASE.

Ms. Conlin anticipates, in accordance with her plea agreement, that the government will be filing a Motion for Downward Departure based on Ms. Conlin's substantial assistance to the ATF agents who confronted her with the true facts of her relationship with Rucker. She detailed every aspect of the relationship, divulged all she knew about his life, and affirmed all the transactions they had undertaken. She agreed to coo-operate then, and later entered into a co-operation agreement to testify if needed against Mr. Rucker.

Ms. Conlin recognizes that this departure is dependent upon a government motion, but in anticipation of that motion, we would take this opportunity to address the size and rationale for such reduction. The Court should recognize the importance of Ms. Conlin's co-operation at the outset of this case. She materially assisted ATF in further investigation of Rucker, and provided necessary corroboration of his driving role in the scheme. She verified where the money came from and where the guns had been until Rucker disappeared with them. She gave

ATF his last known whereabouts and did everything she could to help ATF catch him. Without him, she would never have purchased so many guns. Without her they may not have had a case against him. Counsel would suggest that an 8 level departure ( equal to the added levels for number of guns) would be an appropriate measure of departure. That would have her at a level 12, minus 2 for the plea, leaving her at a level 10, or a starting guideline range of 6-12 months in Zone B.

**IV. A DOWNWARD VARIANCE IS APPROPRIATE TO ADDRESS THE SPECIFIC OFFENDER CHARACTERISTICS AT PLAY IN THIS CASE**

Ms. Conlin is requesting this Court to sentence her to a probationary term, or, what would amount to essentially the same thing, one day incarceration with credit for one day already served, and then supervised release. As the Supreme Court has long acknowledged,

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams*, 337 U.S., at 247, 69 S.Ct. 1079; see also *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

*Pepper v. United States*, 562 U.S. 476, 487-8, 131 S.Ct. 1229, 1239-40 (2011). If ever there was a case in which a sentencing should be shaped to "fit the offender and not merely the crime," this is that case.

Congress has given courts this wide discretion in sentencing by its adoption of 18 U.S.C. §3553. *Pepper*. It is also recognized that a sentencing court may, even should, take into full consideration all of the presented characterisics of the defendant before them, and that it is not a prerequisite to leniency to have "extraordinary circumstances" justifying a variance from the suggested guideline

range. *United States v. Autrey*, 555 F.3d 864,872(9th Cir., 2009). Factors such as family support, need for treatment, cooperation, and the utter lack of previous contact with the criminal justice system have all been approved as bases upon which a sentencing court can make a decision to vary downward in its imposition of sentence. *See, generally, Autrey*; *United States v, Ruff*, 535 F.3d 999(9th Cir., 2008).

In this case, counsel would urge the court to find that these same factors warrant leniency in this case. Ms. Conlin was clearly not the planner, supervisor, or primary beneficiary of this series of purchases. She was duped into her actions by a man who lied to her about who he was, where he was from, what his name was, what his intentions toward her were, and what he was doing with all these guns. She cooperated as fully as she could the same day she found out his deceptions, and remained ready to cooperate through trial, if necessary. She has a good job, the support of her co-workers, the support of her family, responsible plans for the future, and absolutely no contact with the criminal justice system before or since. Her performance on pre-trial release has been exemplary. She suffers from PTSD and is in need of significant out-patient psychotharapy to resolve that issue, and there is every reason to believe that with her innate resilience, she will be able to do just that.

In sum, this is a woman who does not need to be incarcerated. It would not impress on her anymore than her arrest, indictment, and conviction already have the wrongfulness of her actions; it would not increase the security of her community; it would burden her children with her absence; it may be difficult to keep open the job she has done so well at; it would essentially serve no beneficial purpose at all.

**V. CONCLUSION**

For all the foregoing reasons, Rochelle Renee Conlin requests that the Court shape a sentence that does not require incarceration, and give her the opportunity, abd the support, to rebuild her life and continue to contribute meaningfully to her

family and her community.

RESPECTFULLY SUBMITTED this 6th day of March, 2023.

s/ Michael B. Bernays
Michael B. Bernays
Attorney for Defendant

Copy of the foregoing sent Via EFC
6th day of March, 2023, to:

Coleen Patricia Schoch, AUSA
US Attorney's Office

By: s/ Michael B. Bernays

*\Sentencing Memoramdum.wpd